1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS (EL PASO)

2

3  UNITED STATES OF AMERICA,   . Case No.: 3:24-CR-00699(2)-KC-2
                     .

         Plaintiff,     .

4                     .

         vs.          . El Paso, Texas

5

  JAVIER CARDOZA RODRIGUEZ,   .

6  ALSO KNOWN AS R-100,     .

  ALSO KNOWN AS SENSEI,    .

7  ALSO KNOWN AS ROLEX,     .

  ALSO KNOWN AS KARATEKA,    .

8                     .

        Defendant.   . Friday, September 20, 2024

9  . . . . . . . . . . . . . . . 8:45 A.M.

**FILED**

December 26, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Belinda Gamez_
           DEPUTY

10

11

12

13      TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING
        BEFORE THE HONORABLE MIGUEL A. TORRES
         UNITED STATES MAGISTRATE COURT JUDGE

14

15

16  APPEARANCES ON NEXT PAGE.

17

18

19  Deputy Clerk:      Fidel Morales
                United States District Court

20               525 Magoffin Avenue, Suite 105
                El Paso, Texas 79901

21  Transcription Service: Liberty Transcripts

22               9107 Topridge Drive
                Austin, Texas 78750

23               (847) 848-4907
                DBPATEL1180@GMAIL.COM

24               www.libertytranscripts.com

25  Proceedings recorded by electronic sound recording;
  transcript produced by transcription service.

```
1    APPEARANCES:

2    For the Government:     United States Attorney's Office
                             BY: STEVEN SPITZER, ESQUIRE
3                            700 East San Antonio Avenue, Suite 200
                             El Paso, Texas 79901
4                            (915) 534-6884
                             steven.r.spitzer@usdoj.gov
5
     For the Defendant:      Valenzuela Law Firm
6                            BY: FELIX VALENZUELA, ESQUIRE
                             701 Magoffin Avenue
7                            El Paso, Texas 79901
                             (915) 209-2719
8                            felix@valenzuela-law.com

9    For the Interpreter:    Tess Saenz

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                                INDEX

2                                                          Page

3  Case called                                              4
   Defendant enters plea                                    5
4
   Arguments on Government's Motion To Detain
5    By: Mr. Spitzer                                        38
     By: Mr. Valenzuela                                     39
6  Court's Ruling on Government's Motion To Detain          40

7  End of Proceedings                                       41
   Certification of Transcriber                             41
8
   WITNESSES FOR THE GOVERNMENT:
9
   URIEL ACOSTA
10     Direct Examination by Mr. Spitzer                     8
       Cross-Examination by Mr. Valenzuela                  23
11
   WITNESSES FOR THE DEFENDANT:
12
    (None)
13

14

15
                                   Marked    Received
16
   EXHIBITS FOR THE GOVERNMENT:
17
    (None)
18
   EXHIBITS FOR THE DEFENDANT:
19
   1 through 5                         36         38
20

21

22

23

24

25


                        **LIBERTY TRANSCRIPTS**
                          **(847) 848-4907**

1        **EL PASO, TEXAS, FRIDAY, SEPTEMBER 20, 2024, 8:45 A.M.**

2            THE CLERK:  All rise.  United States Magistrate

3    Court for the Western District of Texas, sitting in El Paso;

4    the Honorable Judge Miguel Torres presiding.  This Court is

5    now in session.  Please be seated.

6            THE COURT:  All right.  Good morning.  We'll call

7    EP:24-CR-699-KC, United States of America versus Defendant

8    number 2, Javier Cardoza Rodriguez.

9            Let me have announcements of counsel, please.

10           MR. SPITZER:  Good morning, Your Honor.

11           Steven Spitzer for the United States, ready.

12           THE COURT:  Mr. Spitzer, good morning.

13           MR. VALENZUELA:  Good morning, Your Honor.

14           Felix Valenzuela for Defendant, ready.

15           THE COURT:  Mr. Valenzuela, good morning.

16           Pursuant to the Due Process Protection Act, the

17   Government is put on notice as to its disclosure obligations

18   under the Supreme Court precedent of Brady vs. Maryland.  The

19   failure to comply with those obligations on the part of the

20   Government could result in sanctions on the Government.  A

21   written notice to this effect will follow this hearing.

22           And, Mr. Valenzuela, my understanding is you're

23   proceeding on both the District Court arraignment and the

24   detention hearing.

25           MR. VALENZUELA:  That's correct, Your Honor.

1           THE COURT:  Go ahead and have your client stand up.

2           MR. VALENZUELA:  Would you like us at the podium?

3           THE COURT:  No.  We're fine right there, I think.

4           All right.  Mr. Cardoza, you've had the opportunity

5    to review the indictment with your attorney?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:  As to Count 1, conspiracy to kill in a

8    foreign country, how do you plead?

9           THE DEFENDANT:  Not guilty, Your Honor.

10          THE COURT:  Count 2, bringing aliens without

11   authorization for financial gain, how do you plead?

12          THE DEFENDANT:  Not guilty, Your Honor.

13          THE COURT:  Count 3, charging you with conspiracy

14   to bring in aliens, how do you plead?

15          THE DEFENDANT:  Not guilty, Your Honor.

16          THE COURT:  Count 4, charging you with conspiracy

17   to transport aliens, how do you plead?

18          THE DEFENDANT:  Not guilty, Your Honor.

19          THE COURT:  Count 5, conspiracy to possess a

20   controlled substance with the intent to distribute, how do

21   you plead?

22          THE DEFENDANT:  Not guilty, Your Honor.

23          THE COURT:  As to conspiracy to import a controlled

24   substance, how do you plead?

25          THE DEFENDANT:  Not guilty, Your Honor.

1            THE COURT:  Have a seat.

2            Call your first witness.

3            MR. SPITZER:  Your Honor, before I do, may I bring

4  up just a couple of quick matters?

5            THE COURT:  Yes.

6            MR. SPITZER:  Just so the Court -- and the Court

7  may already be aware of the procedural posture here.  So this

8  is a superseding indictment, as the Court knows.  Mr. Cardoza

9  is currently already detained on a different case.  That is

10 in Judge Schydlower's court now.

11            THE COURT:  Okay.

12            MR. SPITZER:  It's the 24-546 case.  And so he's

13 been held detained on that case by, I believe, Judge Berton.

14            THE COURT:  Okay.

15            MR. SPITZER:  This new indictment before this Court

16 now brings in those counts from the, I'll call it the Judge

17 Schydlower indictment.  So now he's charged with that as well

18 as all these new counts.  We will be, after this hearing in

19 the next day or two, moving to dismiss the one out of Judge

20 Schydlower's.

21            THE COURT:  Okay.

22            MR. SPITZER:  So I just -- so the Court

23 understands.

24            THE COURT:  What counts did this superseding

25 indictment add?

1          MR. SPITZER:  The -- everything but the drug count.

2    So the Judge Schydlower case was just the drug counts.  This

3    one adds the murder and the alien smuggling counts.

4          MR. VALENZUELA:  There's also the improper entry?

5          THE COURT:  In the other case?

6          MR. SPITZER:  Was he charged with that in the other

7    case?

8          MR. VALENZUELA:  The other case, correct.

9          MR. SPITZER:  Okay.

10          THE COURT:  Okay.

11          MR. SPITZER:  But that was a misdemeanor.

12          Secondly, Your Honor, in this particular case, I

13    know the Court is aware this Defendant is not here legally.

14    He'll be deported should he be convicted.  I think that's

15    enough for flight risk purposes.  I will certainly put on the

16    agent here momentarily.

17          So the Court is aware, this case has a number of

18    cooperators involved.  We won't be naming them.  And we will

19    be, if the Court will allow, you know, asking enough

20    questions so the Court will understand what information comes

21    from these cooperators, but not so much that it might reveal

22    their identity.

23          THE COURT:  I mean, I would completely make sure

24    that we stay away from any information that might disclose or

25    might tend to disclose identities.  All right?

1          MR. SPITZER:  Yes, Your Honor.  With that, Your

2    Honor, the Government calls Special Agent Uriel Acosta

3    (phonetic).

4          THE COURT:  Okay.  Come on up.

5          Good morning.

6          URIEL ACOSTA, GOVERNMENT'S WITNESS, SWORN

7          THE COURT:  Have a seat, please.

8          THE WITNESS:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10   BY MR. SPITZER:

11   Q    Would you please state your name for the record?

12   A    Uriel Acosta.

13   Q    You're a special agent with the FBI.  Is that correct?

14   A    Correct.

15   Q    And are you the -- one of the main case agents on this

16   matter involving Javier Cardoza Rodriguez?

17   A    Yes, sir.

18   Q    And you've met him on prior occasions, correct?

19   A    Correct.

20   Q    And do you see him in the courtroom right now?

21   A    Yes, sir.

22   Q    Could you please point to where he's sitting and

23   describe what he's wearing?

24   A    Yes, sir.  He's seated to my left-hand side.  He's

25   wearing a red jumpsuit.  And he's seated right next to his

1  defense counsel.

2          MR. SPITZER:  Your Honor, may the record reflect

3  that this witness has identified the defendant?

4          THE COURT:  The record will so reflect.

5  BY MR. SPITZER:

6  Q    Now, Agent Acosta, sometime in 2023, your agency and

7  other agencies you work with learned of a possible leader in

8  the La Linea cartel with the moniker R-100.  Is that correct?

9          MR. VALENZUELA:  Objection.  Leading, Judge.

10         THE COURT:  Overruled.

11         THE WITNESS:  That is correct, sir.

12 BY MR. SPITZER:

13 Q    And if you fast-forward from there to 2024.  Did your

14 agency obtain information about who the identity -- about the

15 identity of R-100?

16 A    Yes, sir.

17 Q    And what information did you receive?

18 A    We received information revealing his identity as Javier

19 Cardoza Rodriguez.

20 Q    At the time, where was Javier Cardoza Rodriguez located?

21 A    He was located here in El Paso.

22 Q    In the United States?

23 A    Correct.

24 Q    Was he allowed to be here on some kind of immigration

25 bond?

Acosta - Direct                              10

1  A    Yes, sir.  At the time, he was waiting for his

2  immigration court hearing pending he had applied for -- to

3  become a resident alien.

4  Q    And did he have a -- have to be reporting regularly to

5  immigration to let them know his whereabouts and so forth?

6  A    Yes, sir.

7  Q    Okay.  Because of the information you received about

8  Javier Cardoza possibly being R-100, was he taken into

9  immigration custody?

10 A    Yes, sir.  He was taken into custody by ICE.

11 Q    And did you or other agents interview him while he was

12 in ICE immigration custody?

13 A    Correct.

14 Q    This was February 15th, I think, of 2024?

15 A    Yes, sir.

16 Q    More or less?

17 A    Correct.

18 Q    Was he mirandized?

19 A    Yes, sir.

20 Q    Okay.  What did he say about whether or not he was R-

21 100?

22 A    He told the agents that he was not R-100, but he worked

23 for somebody with that nickname of R-100.

24 Q    And what, if anything, did he state about his dealings

25 with or working with the La Linea cartel?

1  A     Specifically, he said that he was conducting errands for

2  this person, and he was paying bribes to police officers in

3  Ciudad Juarez to allow the cartel to operate freely.

4  Q     Okay.  So he admitted a criminal activity on behalf of

5  La Linea?

6  A     Yes, sir.

7  Q     But he didn't admit to being a leader or being R-100?

8  A     No, sir.

9  Q     Okay.  Now, in the indictment it lists a number of

10 monikers or nicknames for Mr. Cardoza, R-100, Sensei, Rolex,

11 Karateka, Noava Mondo (phonetic), right?

12 A     Correct.

13 Q     Did you develop -- did your investigation develop

14 evidence that Mr. Cardoza went by those various nicknames?

15 A     Yes, sir.

16 Q     Chief amongst them perhaps is R-100?

17 A     I'm sorry.

18 Q     Chief amongst these nicknames is perhaps R-100?

19 A     Correct.

20 Q     So after Mr. Cardoza admitted to at least criminal

21 activity on behalf of La Linea, did you or other agents find

22 anything in his vehicle or the vehicle he arrived in

23 indicating as such?

24 A     Yes, sir.  We found a baseball cap with the logo of 727,

25 and an airplane also with the logo.

1  Q    Did he admit that that was his hat?

2  A    Yes, sir.

3  Q    Okay.  And what's significant about that hat?

4  A    That logo specifically is known to law enforcement as

5  being a logo used by certain members of La Linea cartel which

6  signifies Boeing 727 which was a type of airplane used by

7  Amado Carrillo Fuentes to fly drugs worldwide.  And now

8  they're using it, you know, to represent that they're members

9  of La Linea cartel.  As you know, Amado Carrillo Fuentes was

10 the creator of the Juarez cartel.

11 Q    And has, you know, Border Patrol, other agents operating

12 in El Paso seen this hat on other people arrested for alien

13 smuggling and things like that?

14 A    Yes.  The same -- the same logo has been identified, as

15 I stated before, used by members of the Juarez cartel.

16 Q    Now, what is a narcocorrido?

17 A    Narcocorrido is a song, it's a ballad composed to notify

18 a person for a certain event.

19 Q    Okay.  And when Mr. Cardoza was found in immigration

20 custody there, or taken into immigration custody, there were

21 some phones he had, correct?

22 A    Yes, sir.

23 Q    Some of the phones he had on his person, right?

24 A    Correct.  There was some of the phones that were seized

25 at the time when he was arrested.

1  Q    And some of the phones were seized from his house here

2  in El Paso?

3  A    Yes, sir.

4  Q    And did your agency get either consent or a search

5  warrant to look in all those phones?

6  A    Yes, sir.

7  Q    Did you find anything in those phones indicating that

8  Mr. Cardoza is indeed R-100 or somebody else with these other

9  monikers listed in the indictment?

10 A    Yes, sir.  Specifically we found conversations between

11 Mr. Cardoza and the singer of certain corridos such as Rolex,

12 Sensei, which are the nicknames Mr. Cardoza was going by in

13 which Mr. Cardoza is helping compose corridos by telling him

14 what to say in the corridos.

15 Q    That singer is Adalid Lopez, correct?

16 A    Yes, sir.

17 Q    And there's text messages or audio messages of

18 Mr. Cardoza writing the lyrics to his songs?

19 A    Correct.

20 Q    Okay.  Were these narcocorridoes found on YouTube, as

21 well?

22 A    Yes, sir.

23 Q    They were written and sung and produced or put out there

24 on the internet?

25 A    Yes, sir.

Acosta - Direct                    14

1  Q    Now, on these phones, did you or other agents find any

2  proof-of-life videos?

3  A    Yes, sir.  We found multiple videos.

4  Q    What are proof-of-life videos?

5  A    Proof-of-life videos are basically videos of recordings

6  of people, migrants, that once they cross into the United

7  States, they have to state their name, and they have to say

8  that they're safe here in the United States.  Those videos

9  are sent to associates either in Mexico or here in the U.S.

10  to prove that the job was completed, which was the illegally

11  crossing those migrants into the U.S.

12  Q    And Border Patrol has facial recognition technology,

13  correct?

14  A    Correct.

15  Q    Were they able to take those videos and link them to

16  actual arrests or interdictions of these aliens in the United

17  States?

18  A    Yes, sir.

19  Q    And you obtained I-213s to confirm that people in these

20  videos that were on his phone were caught in the United

21  States illegally?

22  A    Correct.

23  Q    Is it fair to say there were over 100 of these proof-of-

24  life videos on there?

25  A    Yes, sir.

Acosta - Direct                    15

1  Q    Were there other videos on phones associated with

2  Mr. Cardoza showing criminal activity?

3  A    Yes, sir.

4  Q    Any violent criminal activity?

5  A    Yes, sir.  There was some videos there of people being

6  tortured by what they call tablazos which is basically a

7  person being beaten by -- with a 2 by 4 wooden on their

8  buttocks.  There's also videos of a person being decapitated.

9  Q    Typical cartel kind of stuff?

10 A    Correct.

11 Q    Now, to be fair, Mr. Cardoza is not on those videos.

12 A    No, sir.

13 Q    There's no other communications surrounding the video

14 indicating that he ordered those particular murders.

15 A    No, sir.

16 Q    But they're on his phone.

17 A    Yes, sir.

18 Q    And as you were well aware, the first count in this

19 indictment, this superseding indictment is conspiracy to kill

20 in a foreign country.

21 A    Correct.

22 Q    And the indictment lists the person killed as having the

23 initials of E.G.R.

24 A    Yes, sir.

25 Q    And did your investigation reveal the nickname, the

1  common nickname or moniker of E.G.R.?

2  A    Yes, sir.  He was known as Winter.

3  Q    Winter.  Okay.  And did you confirm with the Mexicans

4  that Winter was indeed murdered?

5  A    Yes, sir.  We received a police report.

6  Q    Now, at the time of Winter's murder, when was that?  Was

7  that in --

8  A    I believe it was sometime in January of 2024.

9  Q    January of '24?

10  A    I believe so, sir.

11  Q    Did you obtain evidence indicating that Mr. Cardoza was

12  in the United States at the time of Winter's murder?

13  A    Yes, sir.

14  Q    What evidence did you obtain indicating that?

15  A    We obtained the records from ICE where he was reporting

16  with his GPS being that he was here in the United States at

17  the time.  We also obtained flight records indicating that he

18  was flying I believe from Florida to El Paso, Texas, at the

19  time of the murder, the day of the murder.

20  Q    There's also some phone records, as well?

21  A    Yes, sir.

22  Q    And the immigration records?

23  A    Correct.

24  Q    So as far as the murder of Winter, that first came to

25  the attention of law enforcement when Defendant 1 in this

1  case, Alexis Maldonado-Munoz, was arrested for alien

2  smuggling.  Is that right?

3  A    That is correct.

4  Q    It started out as a normal alien smuggling case?

5  A    Yes, sir.

6  Q    But then a video was found on his phone?

7  A    Yes, sir.

8  Q    Right?  What did that video depict?

9  A    The video depicted a murder, a person being murdered by

10  one shoot to his head.  Later, Mr. Maldonado was questioned

11  about the video, and he admitted to having participated in

12  the murder of that person.  He identified the person as

13  Winter.  And he indicated that that murder was committed at

14  the behest of R-100.

15  Q    Okay.  Did he say that R-100 was the boss that he had to

16  get permission from in order to do that?

17  A    Yes, sir.

18  Q    Now, he had never laid eyes on R-100, right?

19  A    Not to my knowledge, sir.

20  Q    Did you find any communications in Mr. Cardoza's phones

21  or other phones indicating that everybody's talking about the

22  same guy, that being Winter?

23  A    Yes, sir.

24  Q    Could you please tell the Court about that?

25  A    Yes.  Specifically, we have -- I found some text

1    messages on one of the phones that we seized from Mr. Cardoza

2    which he's communicating with a person by the name of Chino

3    (phonetic).  And this specific text message, Chino is asking

4    for Cardoza to give the green light to pick up Winter.  And I

5    believe he said that Winter was either misbehaving or there

6    was some kind of debt that was owed, and he wasn't being

7    responsible for, and he was hiding.  The response was he gave

8    him the green light to pick him up, but he indicated for him

9    not to kill him.  And if I believe, this conversation

10   occurred in October or November of 2023.

11   Q    Now, Mr. Maldonado, his nickname is Tarzan, right?

12   A    Yes, sir.

13   Q    Was there anything in any of these phones that you all

14   have viewed indicating that Mr. Cardoza ordered some

15   discipline of Tarzan for something else he had done?

16   A    Yes, sir.

17        There was some communication we also found on one of his

18   phones in which a person in Ciudad Juarez who owns a bar

19   complained about Mr. Tarzan misbehaving in the bar and

20   shooting at somebody outside the bar.  Of course, he was

21   worried about the publicity and the (indiscernible for this

22   event.  And he identifies Tarzan as being one of his guys.

23   And he asked Mr. Cardoza to discipline Tarzan because of this

24   event.

25   Q    And did you confirm that Tarzan was indeed disciplined,

1   or beaten?

2   A    Yes, sir.  We confirmed that Tarzan was disciplined

3   with, again, by receiving some tablazos.

4   Q    Now, that's the charged murder, correct?

5   A    Yes, sir.

6   Q    Are you and your agency working with other agencies also

7   investigating other possible murders that occurred in Juarez

8   while Mr. Cardoza was in the United States?

9   A    We are.

10  Q    Now, as stated before, there was a number of cooperators

11  in this case.

12  A    Yes, sir.

13  Q    You or other agents have talked to many people about

14  trying to get information about Mr. Cardoza.  Is that right?

15  A    Correct.

16  Q    Some indicated a willingness to testify.

17  A    Yes, sir.

18  Q    In particular, though we're not going to go into a lot

19  of detail, particular, three at this point, if not more, are

20  willing to testify.

21  A    Correct.

22  Q    Are there a number of individuals who have indicated or

23  have spoken about Mr. Cardoza and criminal activity but who

24  have indicated that they are not willing to testify?

25  A    Yes, sir.

1  Q    Have they told you why?

2  A    They indicated they're afraid of the repercussions of

3  them testifying against Mr. Cardoza.

4  Q    So going to three of these -- three of the cooperators

5  who have indicated a willingness to testify, the first one

6  was involved in some cartel fighting in Juarez.  Is that

7  right?

8  A    Yes, sir.

9  Q    Particular this cooperator was working for La Linea in a

10 fight against Sinaloa?

11 A    Correct.

12 Q    Did this -- what did this person say about who was

13 giving the orders as to where to go and who to kill during

14 these fights?

15 A    R-100.

16 Q    How often did this person hear R-100 giving those

17 orders?

18 A    He heard it on a daily basis via the radio.

19 Q    Now, this person never laid eyes on R-100.

20 A    Correct.

21 Q    But was he -- did he identify Mr. Cardoza as R-100 VA

22 voice comparison?

23 A    Correct.

24 Q    And the voice recording of Mr. Cardoza that he listened

25 to was obtained from the immigration detention facility?

1  A    Yes, sir.

2  Q    Sort of like a jail call but from the immigration camp.

3  A    Yes, sir.

4  Q    He listened to that and said that's the guy I heard

5  daily telling us who to go kill and what to do.

6  A    Correct.  He identified the voice as that as being of R-

7  100.

8  Q    Now, this person, did he also discuss a particular

9  cocaine seizure that happened in the United States?

10 A    Yes, sir.

11 Q    Okay.  And did he say, based on his knowledge of things,

12 who that cocaine belonged to?

13 A    He said he worked for a person who worked for R-100, and

14 the cocaine belonged to R-100.

15 Q    Okay.  Now, a second cooperator was involved in the

16 alien smuggling aspect of things covered by this indictment,

17 correct?

18 A    Yes, sir.

19 Q    What leadership role did he say R-100 held in the alien

20 smuggling or in La Linea?

21 A    That person said that R-100 held a leadership role that

22 he was receiving quotas from the immigration, you know, for

23 smuggling aliens.  He said that he had over 500 people under

24 his command.

25 Q    Okay.  Did this person pick Mr. Cardoza out of a photo

1  lineup?

2  A    Yes, sir.

3  Q    What did he say -- what did he identify him as?

4  A    He identified him as R-100, Sensei, Rolex, Karateka,

5  Noava Mondo.

6  Q    Now, there's another cooperator who's a former Mexican

7  police officer.

8  A    Yes, sir.

9  Q    Did he say he ever laid eyes on -- well, somebody with

10 one of the monikers associated with Mr. Cardoza while he was

11 working in Juarez?

12 A    Correct.

13 Q    And what context did he say he laid eyes on Mr. Cardoza

14 using one of those other monikers?

15 A    He recounted an event in which this police officer

16 pulled over a vehicle.  And in pulling over the vehicle,

17 there was a state police car that parked behind the officer.

18 The state police officer got out the car and told the police

19 officer to release the vehicle because Karateka didn't want

20 the vehicle to be pulled over.  The police officer said that

21 he looked at the state police officer's vehicle and he

22 observed Karateka there in the vehicle.

23 Q    Did he also say that he observed him meeting with some

24 police brass, Juarez police brass along with members of La

25 Linea?

1   A    He recounted doing protection for certain meetings in

2   which Karateka was present, and all the leaders of the Juarez

3   cartel were meeting with police officers.

4   Q    And did he pick Mr. Cardoza out of a photo lineup?

5   A    Yes, sir.

6          MR. SPITZER:  I pass the witness.

7          THE COURT:  Mr. Valenzuela?

8          MR. VALENZUELA:  Thank you, Judge.

9                       CROSS-EXAMINATION

10  BY MR. VALENZUELA:

11  Q    Okay.  Special Agent Acosta, I'm going to ask you a few

12  questions, and I'm going to try to be as clear as possible.

13  Can we have an agreement that if you don't understand what

14  I'm asking, you'll let me know and I'll rephrase?

15  A    Yes, sir.

16  Q    Okay, sir.  So I want to ask you a few things.  First,

17  let's talk about the phones that you found.  You found about

18  six phones.  Is that right?

19  A    Sounds about right, sir.

20  Q    Okay.  You found two on the person of my client.  Is

21  that right?

22  A    I believe so.

23  Q    And then two were in a truck that was in the parking lot

24  at the immigration facility.  Is that right?

25  A    I think so, sir.

1  Q    And then two were at a separate location at a house.  Is

2  that right?

3  A    Correct.

4  Q    Okay.  Now when you talk about the phones that had the

5  proof-of-life, it wasn't the phones that were found on my

6  client.  Is that correct?

7  A    It was in the phone that was -- one of the phones that

8  was found at his house.

9  Q    Okay.  So remember the agreement we had at the

10  beginning; if you don't understand the question I'm asking,

11  you'll let me know?

12  A    Yes, sir.

13  Q    Okay.  Let me ask that again.  The proof-of-life videos,

14  you didn't find them on the phones that were on my client's

15  person.  Is that right?

16  A    I don't think so, sir.  From what I recall, it was one

17  of the phones that was found at the house.

18  Q    Okay.  I'm sorry.  Do you understand my question, sir?

19         MR. SPITZER:  Your Honor, I object.  He answered

20  the question.

21         THE COURT:  He properly answered the question.  I

22  mean, you're trying to get to --

23         MR. VALENZUELA:  Whether or not --

24         THE COURT:  -- the proof-of-life videos, whether

25  they were found on phones that were seized from your client's

 1  person?

 2              MR. VALENZUELA:  Exactly, sir.

 3              THE COURT:  I thought he answered.

 4              MR. VALENZUELA:  Okay.  Thank you.

 5  BY MR. VALENZUELA:

 6  Q    Now, the phoners that were found in the truck, the two

 7  phones, none of those had any of the proof-of-life videos.

 8  Is that correct?

 9  A    I don't think so, sir.

10  Q    Okay.  And of those six phones, there's no metadata,

11  there's no hard evidence that show that my client was

12  actively using any of those phones.  Is that right?

13  A    That is not correct, sir.

14  Q    Okay.  What metadata did you find on those phones that

15  showed he was operating them?

16  A    We found some pictures of your client on those -- on one

17  of the phones, specifically the phone where we found the

18  proof-of-life videos.

19  Q    Okay.  Let me ask you about that.  So first, that's not

20  metadata, right?  Do you understand what metadata is?

21  A    Yes, sir.

22  Q    Okay.  Is that metadata, a picture?

23  A    It's part of the, you know, indicating that he was using

24  the phone.

25  Q    Is that metadata?  Does a picture constitute metadata?

1   A     It has metadata, sir.

2   Q     The picture has metadata, correct?

3   A     Correct.

4   Q     Okay.  The metadata in those pictures, how did you tie

5   that to my client?

6   A     So we --

7   Q     Did you look at the GPS locations on the metadata?

8   A     We have not.

9   Q     Did you look at the date of creation of the metadata?

10  A     Yes, sir.

11  Q     Okay.  When was it created?

12  A     I believe it was September of 2023.

13  Q     Okay.  What about the modification date?

14  A     I haven't really looked into the phone, the picture

15  itself.  I saw when the picture was taken.  And it was found

16  on the phone that -- where the proof-of-life videos were

17  found, as well.

18  Q     Okay.  So you did not look at the metadata of the photo?

19          MR. SPITZER:  You know, at this time I'm going to

20  object for purposes of detention as to how deeply he went

21  into metadata.  I don't think that's relevant.

22          THE COURT:  We're going to have discovery.

23          MR. VALENZUELA:  Judge, this goes exactly to the

24  strength of the case.  That is all completely circumstantial

25  evidence that they didn't investigate the circumstantial

1  evidence.  And so it goes to the strength of the case as far

2  as detention.

3            THE COURT:  Okay.  I'm going to grant you a little

4  leeway on that.  We're not going to get into the weeds about

5  technical aspects about this data.  You can ask, but let's

6  move on, sir.

7            MR. VALENZUELA:  Okay.

8  BY MR. VALENZUELA:

9  Q    So just to wrap up, there's no information that he took

10  that photo, or that photo was taken with that phone.  Is that

11  correct?

12  A    I believe the phone was examined by a forensic analyst

13  from FBI.  I'm not allowed to -- I don't have the knowledge

14  that the person has.  That person will be the one who you

15  will be asking the person as to the metadata and anything of

16  that nature.

17  Q    And so I'm just asking you what you know, okay?  So if

18  you don't understand what I'm asking, let me know and I'll

19  clarify, okay?

20  A    Okay.

21  Q    Okay.  So let me ask you then about, you said that there

22  were numerous witnesses that are willing to come forward.  Is

23  that right?  About three of them?

24  A    Correct.

25  Q    Okay.  Now, isn't it true that one of them identified

1  the Defendant, or I'm sorry, R-100 as dark skin, chubby, with

2  a beard, and not tall.  Is that correct?

3  A    None of the ones that are willing to testify, sir.

4  Q    None of those said that?  None of the witnesses.

5  A    None of the three that you mentioned right now.

6  Q    Okay.  Okay.  Isn't it true that another witness that is

7  willing to testify described the Defendant as a short, fat

8  male in his 40s?

9  A    He -- when he identified a person, he identified your

10  client.  He identified him as Karateka.  And he did not give

11  those characteristics for Karateka or Sensei.

12  Q    Okay.  None of those witnesses gave any of that

13  descriptions?

14  A    We have some witnesses that have indicated that R-100

15  where those -- have those characteristics.  But none of the

16  three that you're mentioning.

17  Q    So none of the witnesses who are willing to testify have

18  given those physical descriptions of the defendant.  Is that

19  fair?

20  A    So there's some things here.  When the defendants were

21  shown a six-pack array with different people, they picked up

22  your client as being one of the monikers.  I believe the

23  person you're referring to depicted him as, or identified him

24  as Sensei or Karateka.

25      And he did not give the descriptions for your client.

1  What he did say was that he was told that R-100 was with

2  those descriptions, but he did not identify your client as

3  R-100.  He identified him as one of the other monikers that

4  we knew for him, which is Sensei or Karateka.

5  Q    And one of the witnesses that's going to testify

6  identified him as -- used the name Richie?

7            MR. SPITZER:  Your Honor, I'm going to object to

8  the relevance of that as going far afield.  I know where

9  Mr. Valenzuela's coming from.  We have provided information

10  to him pursuant to Brady from some witnesses that, you know,

11  had heard other description of him that were different.

12  That's why he's asking those questions.

13            But I don't think it's relevant for detention

14  purposes.  This witness has already testified that the people

15  that are willing to testify against him either never met him,

16  identified his voice or picked him out of a photo lineup.

17            THE COURT:  I'm going to overrule the objection.

18  But we're not going to spend a whole bunch of time on this.

19  I mean, we're here for strength of the case purposes only.

20  Just limit questions, the amount of questions that we ask

21  (indiscernible).

22  BY MR. VALENZUELA:

23  Q    And then finally, sir, one of the other witnesses said

24  that they did not believe that R-100 was not involved in drug

25  trafficking, which was Count Number 5 and 6.  Is that right?

1  A    The person said that he did not know the activities for

2  what Mr. Cardoza was involved in.  And he said that he did

3  not believe that he was involved in drug trafficking.

4  Q    Okay.  And you specified that one of the witnesses

5  identified the defendant's real voice sample.  Is that right?

6  A    Correct.

7  Q    And you're aware of confirmation bias, that term.  Is

8  that correct?

9  A    I'm sorry?

10 Q    You're aware of the term confirmation bias?

11 A    Yeah.  Yeah.

12 Q    Let me explain.  Did you show multiple voice samples to

13 that individual?

14 A    We showed him defendant different pictures whenever told

15 him that it was R-100, we showed the -- or played the

16 recording.  And immediately he said that's R-100.

17 Q    Okay.  Did you show that person multiple voice samples?

18 A    Not at that time, sir.

19 Q    Okay.  And you know that you do six-packs so that way

20 you're not overly encouraging someone to pick out a

21 particular individual.  Is that correct?

22 A    Correct.

23 Q    But you didn't do that with the voice samples, right?

24 A    We didn't have any other voices at the time.  Or samples

25 at the time.

1  Q    Okay.  And you are aware that at the time that he was in

2  immigration, Orlando Mondragon was his attorney, right?

3  A    I'm not sure who the attorney was at the time, sir.

4  Q    Okay.  Well, if he testified at the prior detention

5  hearing that it was Orlando Mondragon, would that be true?

6          MR. SPITZER:  Objection.  Relevance to who his

7  immigration attorney may or may not have been.

8          MR. VALENZUELA:  Again, it goes straight to the

9  case.  The fact that they talked to him despite the fact that

10 he had an attorney without allowing the attorney to be there.

11 So it's a complete violation of Miranda which goes to the

12 strength of the case, Judge.

13         THE COURT:  I'm going to sustain the objection.  I

14 don't know how that's relevant for today's purposes.

15 BY MR. VALENZUELA:

16 Q    You said you found a hat in his truck, or I'm sorry, in

17 his cousin's truck that has 727, is that right, on it?

18 A    We found a hat in the truck that he was driving at the

19 time, or he was riding at the time, when he was detained by

20 ICE.

21 Q    He wasn't driving at the time because he was inside the

22 facility.  is that right?

23 A    When he was detained, yes.

24 Q    Okay.

25 A    When he was arrested.

1  Q    So it's fair to say you found the hat inside the truck

2  that -- his cousin's truck.

3  A    I don't know whose truck that was.  The person who was

4  with him, they claimed ownership of the truck.  We found a

5  hat in the truck that he was driving when he came to the

6  facility when he was arrested.

7  Q    The hat is commercially produced, right?

8  A    Yes, sir.

9  Q    Okay.  Now, when you talked to my client, he was out on

10 immigration bond.  Is that right?

11 A    Yes, sir.

12 Q    And you knew that he had conditions to follow while he

13 was on that bond, right?

14 A    That was my understanding, sir.

15 Q    And it included some kind of GPS monitoring from his

16 phone.  Is that correct?

17 A    Yes, sir.  It was either the phone or some sort of

18 device.

19 Q    Okay.  And there were no violations at all of that

20 immigration bond.  Is that right?

21 A    I did not enquire about any violations, sir.  I do not

22 know the answer.

23 Q    Okay.  So there -- the -- there's no physical evidence

24 that ties Mr. Cardoza to any of the crimes, meaning there's

25 no photos of him being there with the proof-of-life, there's

1   no photos of him being there at the murders.  Is that right?

2   A    We have some conversation.  I would have to go into

3   detail with the conversation.  We had some conversations

4   tying him to the events.  And we have witnesses coming

5   forward that he was -- he was a person, you know, ordering

6   those events.

7   Q    Okay.  So there's no physical evidence is what you're

8   saying.

9   A    We don't have any records of him.  No, sir.

10  Q    Thank you.

11  A    Or any pictures of him at the events.

12  Q    So the majority of witnesses never met R-100.  Is that

13  right?

14  A    I'm sorry?

15  Q    The majority of witnesses never physically met R-100.

16  A    I wouldn't say the majority of them.  We have some

17  person -- some people that have met him in person.

18  Q    So it's your testimony before the Court that the

19  majority did meet R-100?

20  A    I didn't say the majority, sir.  I said there's some of

21  them that have not met him in person.  They have heard of him

22  and heard his voice.  But we have others that have met him.

23  Q    There's no evidence at all of Mr. Cardoza handling any

24  weapons.  Is that right?

25  A    We have some pictures on his phones -- on his phone

1  where there is some pictures of weapons on his phone.

2  Q    Okay.  Again, if you don't understand my question, let

3  me know.  There's no photos of Mr. Cardoza handling any

4  weapons.  Is that right?

5  A    I haven't seen any photos, sir.

6  Q    Thank you, sir.  There's no photos of him handling any

7  drugs.  is that right?

8  A    I haven't seen him with drugs, sir.  I haven't seen any

9  pictures of that.

10  Q    Okay.  And there's no photos of him with any of the

11  proof-of-life aliens.  Is that right?

12  A    He is not in those videos, sir.

13  Q    Thank you, sir.  You didn't find any evidence regarding

14  financial records of Mr. Cardoza that would show he was R-

15  100.  Is that right?

16  A    As far as financial records, we did have a conversation

17  which he is, you know, sending money to the singer, Adalid

18  Lopez, for the corridos that we spoke about before.

19  Q    So this singer wrote songs.  And it's your testimony

20  that Mr. Cardoza told him to write songs for R-100?

21  A    For either one of those monikers, R-100 or Karateka or

22  Sensei, excuse me, Sensei or Rolex.  And there is

23  communications between the singer where he's asking for his

24  payment, and he's replying that he's going to send the

25  payment, if I recollect correctly, was about 2,000.  I don't

1  know if it was pesos or dollars, or somewhere in that area.

2  Q    For the song, right?

3  A    Pardon?

4  Q    For the song?

5  A    For the song, for the payment of the song.

6  Q    Okay.  You never recovered any fingerprints or DNA of

7  Mr. Cardoza on any of these crimes.  Is that right?

8  A    No, sir.

9  Q    Okay.  There's no text messages on the phones that were

10 found on Mr. Cardoza's person regarding the proof-of-life

11 videos, right?

12 A    Not that I recall.

13 Q    Okay.  There's no text messages on Mr. Cardoza's phones

14 that were found on his person regarding the Count 1 of the

15 murder.  Is that right?

16 A    On his phone, that was where we found the message from

17 the bar owner talking about Tarzan, which is linked to the

18 murder.

19 Q    Okay.  Let me ask that again.  There's no phones that

20 were found on his person that had text messages regarding the

21 proof-of-life alien trafficking.  is that correct?

22 A    Not that I recall, sir.

23          MR. VALENZUELA:  Okay.  Thank you, Judge.  Pass the

24 witness.

25          THE COURT:  All right.  Any redirect?

1         MR. SPITZER:  No, Your Honor.

2         THE COURT:  You can step down.

3         THE WITNESS:  Thank you, Your Honor.

4         THE COURT:  Any other witnesses or evidence,

5  Mr. Spitzer?

6         MR. SPITZER:  No, Your Honor.

7         THE COURT:  Mr. Valenzuela, any witnesses or

8  evidence?

9         MR. VALENZUELA:  We do have some evidence and some

10  proffer, Judge.  First, I ask the Court to take judicial

11  notice of the exhibits that were presented at the prior

12  detention hearing regarding Mr. Cardoza.  I brought some of

13  those here for the Court.  They're immigration paperwork.

14         THE COURT:  Okay.  Can you, well, proffer to the

15  Court basically what is -- what are the contents of those

16  exhibits?

17         MR. VALENZUELA:  Perfect, Judge.  Thank you.  So

18  what I'm going to mark as Exhibit 1 is the Department of

19  Justice immigration paperwork.  It is Form EOIR-28.  And

20  that's a notice of entry of appearance for an attorney before

21  the Immigration Court on behalf of Mr. Cardoza for his

22  application for adjustment of status here.  I'll mark that as

23  Defendant's Exhibit 1.  And this is presented at the prior

24  detention hearing.

25         Defendant's Exhibit 2 which I'm marking is Form I-

1   213 which is a petition for Mr. Cardoza to adjust his status

2   here in the United States.  Defendant's Exhibit 3 is a notice

3   to appear from an immigration judge that allows Mr. Cardoza

4   to present in the United States while he considers the

5   application.

6          THE COURT:  What are the dates of these documents?

7          MR. VALENZUELA:  Yes, Judge.  For Exhibit 1, the

8   date is August 21st, 2023.  And it's signed by Orlando

9   Mondragon.  For Exhibit 2, it is June 2nd, 2023.  For Exhibit

10  3, it was June 22nd, 2023.

11         And then finally, what I'm marking as Defendant's

12  Exhibit 4 is an I-797C which is dated May 22nd, 2024.  And

13  that's what's giving him notice that his petition has been

14  approved.  And then finally --

15         THE COURT:  Petition for adjustment of status.

16         MR. VALENZUELA:  Yes, Your Honor.  That's correct.

17  And that's from April of this year.  And then finally, what

18  I'm marking as Defendant's Exhibit 5 is a transfer to the

19  courses he's taking while in custody.  It'll show that he's

20  passing math, reading, science, social studies, and a writing

21  class.  May I approach, Your Honor?

22         THE COURT:  Have you shown them to the --

23         MR. VALENZUELA:  Yes, Your Honor.

24         MR. SPITZER:  Yes he has, Your Honor.  But on

25  the --

1            THE COURT:  Is there any objection?

2            MR. SPITZER:  No.

3            THE COURT:  All right.  And you move for the

4   admission of these?

5            MR. VALENZUELA:  Yes, Your Honor.  We move to admit

6   them.

7            THE COURT:  Let me see.  Who is this petitioner,

8   Ms. Cruces (phonetic)?

9            MR. VALENZUELA:  His wife, Your Honor.

10           THE COURT:  And you're moving for the admission of

11  these five exhibits?

12           MR. VALENZUELA:  So moved, Your Honor.

13           THE COURT:  Okay.  Then Defense Exhibits 1 through

14  5 are admitted and made part of the record.

15       (Whereupon, Defendant's Exhibits 1 through 5 were

16  admitted into evidence.)

17           THE COURT:  All right.  What else did you have?

18           MR. VALENZUELA:  That's all I have by way of

19  proffer.  I have closing, but no other evidence.

20           THE COURT:  All right.  I'll hear your argument.

21           MR. SPITZER:  From here, Your Honor, or from the --

22           THE COURT:  Wherever you prefer.

23           MR. SPITZER:  The Government persists in its motion

24  to detain.  It's clear that this defendant is a flight risk.

25  And more importantly, he's a danger to the community.  He's

1   also -- there's also presumption with the drug counts.  We

2   ask that the Court detain.

3           THE COURT:  Thank you.  Mr. Valenzuela?

4           MR. VALENZUELA:  Thank you, Judge.  So, Your

5   Honor --

6           THE COURT:  Wherever you'd like.

7           MR. VALENZUELA:  Just by way of analogy, Judge, I

8   think the Government's case here is extremely circumstantial.

9   It's all finger pointing.  There's no hard evidence linking

10  the defendant to any of these crimes, which shows that the

11  strength of the case is extremely weak.

12          And what it reminded me is growing up, I really

13  liked Wu-Tang.  I really liked Dr. Dre.  I really liked Snoop

14  Dog.  What that means is that this agent would put me in

15  detention because I like that gangster rap and because I

16  would wear LA Raiders gear.

17          So the fact that they found a commercially-produced

18  hat in a truck that was driven by his cousin, the fact that

19  he is in communication with a songwriter, and then the fact

20  that there's circumstantial evidence of people that have

21  heard a voice, and again, there was no multiple exemplars

22  shown to the individual, there's no six-pack.  There's just

23  one voice which is very much against protocol of being able

24  to contain confirmation bias.  The fact that all that

25  happened, Your Honor, means anyone can be thrown into prison

1  for these cases.

2         Your Honor, I mean, the fact that he played in a

3  band, that would be enough evidence for the Government to put

4  an individual and ask to detain him.  So we're saying as far

5  as the facts of the strength of the case is extremely weak.

6         Flight risk, here immigration, he was on

7  immigration bond for a number of months.  He had no

8  violations at all.  He had GPS monitoring.  He was completely

9  compliant with it.  Whenever the immigration judge ordered

10  him to appear, he was there.  In fact, when the immigration

11  agents asked him to appear, not ordered, asked him, he was

12  there and he attended each individual time.  He complied with

13  every single judicial order.

14         And so we believe that there are conditions that

15  can ameliorate the risk of flight and the danger to the

16  community.  And so we believe we've met the presumption and

17  would shift the burden to the Government, Your Honor.  Thank

18  you.

19         THE COURT:  Okay.  Very well.  The Court will grant

20  the Government's motion to detain.  Based on the nature of

21  the allegations, I do find that the defendant represents a

22  risk -- rather, a danger to the community (indiscernible).

23         Is there anything else, Mr. Valenzuela?

24         MR. VALENZUELA:  No.  Thank you very much, Your

25  Honor.

1          THE COURT:  Anything else, Mr. Spitzer?

2          MR. SPITZER:  No, Your Honor.

3          THE COURT:  Thank you very much.  We are in recess.

4      (Whereupon, at 9:26 a.m., the hearing was adjourned.)

5                         * * * * *

6

7

8               C E R T I F I C A T I O N

9          I, DIPTI PATEL, court-approved transcriber, certify

10   that the foregoing is a correct transcript from the official

11   electronic sound recording of the proceedings in the above-

12   entitled matter, and to the best of my ability.

13

14

15   _____

16   DIPTI PATEL, AAERT CET-997

17   Expires: December 6, 2026

18   LIBERTY TRANSCRIPTS          DATE:  December 23, 2024

19

20

21

22

23

24

25